62 F.3d 1417
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Jacqueline BINDER, Administratrix of the Estate of James C.
Binder, Deceased, Plaintiff-Appellant,
James C. Binder, Deceased Plaintiff,
v.
INDIANA MICHIGAN POWER COMPANY d/b/a Donald C. Cook Nuclear
Plant, Defendant and Third Party Plaintiff-Appellee,
Nuclear Support Services, Inc., Third Party Defendant-Appellee.
 No. 93-1865.
 United States Court of Appeals, Sixth Circuit.
 Aug. 7, 1995.
 
 1
 Before: SILER and DAUGHTREY, Circuit Judges; and ZATKOFF,[1] District Judge.
 
 
 2
 This matter is before the Sixth Circuit on plaintiff's appeal of the district court's decision granting summary judgment to defendants in this wrongful death action. The district court held that: 1) Nuclear Support Services, Inc. was a labor broker; 2) Indiana Michigan Power Company was a co-employer of the deceased; and 3) workers' compensation is plaintiff's exclusive remedy. We AFFIRM.
 
 I.
 
 3
 Decedent James Binder (hereinafter "Binder") was killed in an industrial accident on July 13, 1990. Binder was an electrician employed by Nuclear Support Services Inc. ("NSS"), and was working on-site at the Cook Nuclear Power Facility at the time of the accident. The Indiana Michigan Power Company ("I&M") owns the Cook Facility.
 
 
 4
 Jacqueline Binder, decedent's wife and administratrix of his estate, filed an action against NSS and I&M after the accident. I&M then sued NSS for third party liability. NSS filed a motion for summary judgment on behalf of I&M, and I&M joined the motion. After holding that NSS was a labor broker and I&M was a co-employer, the district court granted defendants' motion and dismissed the case.
 
 II.
 
 5
 This case is governed by Michigan law. NSS and I&M argue that plaintiff's recovery is limited by the "exclusive remedy provision" of Michigan's Worker's Disability Compensation Act. M.C.L. Sec. 418.131; M.S.A. Sec. 17.237(131). M.C.L. Sec. 418.131 provides that "[t]he right to the recovery of benefits as provided in this act shall be the employee's exclusive remedy against the employer." Id. Consequently, this case turns on whether I&M was decedent's employer.
 
 
 6
 Whether a company is a particular worker's "employer" under the workers' compensation act is a question of law for the courts to decide, if the evidence on the matter is reasonably susceptible of but a single inference. Nichol v. Billot, 406 Mich 284, 302-303, 279 N.W.2d 761 (1979) (quoting Flick v. Crouch, 434 P.2d 256 (Okla. 1967)). However, where the evidence bearing on the company's status is disputed, or where conflicting inferences may reasonably be drawn from the known facts, the issue is one for the trier of fact to decide. Derigiotis v. J.M. Feighery Co., 185 Mich. App. 90, 94, 460 N.W.2d 235 (1990), appeal denied, 437 Mich. 936 (1991) (citation omitted).
 
 
 7
 Michigan courts rely on the "economic realities test" to establish the existence of an employer/employee relationship. The economic realities test includes four elements:
 
 
 8
 1. control of a worker's duties;
 
 
 9
 2. the payment of wages;
 
 
 10
 3. the right to hire and fire and the right to discipline;
 
 
 11
 4. the performance of the duties as an integral part of the employer's business towards the accomplishment of a common goal.
 
 
 12
 Askew v. Macomber, 398 Mich. 212, 217-18, 247 N.W.2d 288 (1976). No single element is controlling, and the totality of the circumstances must be considered. Farrell v. Dearborn Mfg. Co., 416 Mich. 267, 276, 330 N.W.2d 397 (1982).
 
 
 13
 It is well settled in Michigan that in a situation involving a labor broker, the customer, i.e., the entity seeking temporary help, is considered a co-employer of the individual worker. See Farrell v. Dearborn Mfg. Co., 416 Mich. 267, 330 N.W.2d 397 (1982) (workers in a labor broker situation must be considered employees of both the labor broker and the end-user); and Renfroe v. Higgins Rack Coating & Mfg. Co., 17 Mich. App. 259, 169 N.W.2d 326 (1969). The Farrell court described the typical labor broker situation as follows:
 
 
 14
 The customers of a labor broker typically call in their employment needs on a daily basis, and workers are sent by the broker to fill these needs. After arriving at the place of business, the worker is subject to the control and authority of the customer and the customer's supervisory personnel. The customer has the power to discharge the employee from the daily work assignment and can refuse to accept a worker sent by the broker. The customer does not pay the employee directly. Rather, the labor broker pays the employee and includes as part of its charge to the customer amounts to cover its expenses for compensation premiums, social security, and other taxes.
 
 
 15
 Farrell, 416 Mich. at 275-76. The relationship between NSS and I&M does not match this description in all respects. Thus, the Court must examine the employment arrangement between NSS and I&M.
 
 III.
 
 16
 The language of a written agreement, such as the one between NSS and I&M, is relevant but not controlling. White v. Central Transport, Inc., 150 Mich. App. 128, 129, 388 N.W.2d 274, appeal denied, 425 Mich. 864 (1986); Tolbert v. U.S. Truck Company, 179 Mich. App. 471, 476, 446 N.W.2d 484 (1989). Thus, although the contract between I&M and NSS specifically labels NSS an independent contractor, the Court is not bound by that label.
 
 
 17
 A review of the record demonstrates that I&M exercised significant control over the duties of NSS employees. Under the contract, NSS had to perform the work in accordance with instructions and specifications issued by the I&M engineer. The failure of NSS employees to comply with plant procedures and policies concerning fitness or duty requirements constituted grounds for terminating the contract. Further, I&M retained the right to shut down operations in the event of a safety violation by NSS personnel.
 
 
 18
 Additionally, as NSS employees were not "procedure qualified," they assisted I&M employees who were qualified. The I&M worker was the "lead man" while the NSS employee was a "tool toter." Finally, the duties of NSS's on-site Coordinator were administrative, not supervisory, and NSS did not have any electrical maintenance supervisors on site. Accordingly, while the contract provided that NSS was an independent contractor, in reality, I&M controlled the working nature of the relationship.
 
 
 19
 NSS issued paychecks to Binder and its other employees for work performed at the Cook facility. NSS then billed I&M for the work. I&M provided NSS with the specific invoices to use in the billing and retained the right to review time sheets prior to being billed by NSS. This was the precise process contemplated by Farrell and Renfroe in their discussions of labor brokers.
 
 
 20
 As to the third factor of the economic realities test, I&M had a hand in selecting, and ultimately approved, each NSS employee who worked at the Cook facility. I&M required a psychological examination and background check of potential NSS workers. I&M also had the power to remove a worker from the facility by denying him a necessary access pass and could "fire" an NSS employee from the I&M facility. Moreover, NSS could not unilaterally terminate an NSS employee at the Cook facility. In order to discharge its own employee, NSS had to seek concurrence from I&M.
 
 
 21
 Finally, the parties worked together toward a common objective that was best accomplished through a joint enterprise. As NSS stated: (1) NSS exists to augment nuclear facilities like I&M whenever they undergo outages; and (2) it would be impractical for facilities like I&M to carry the additional staff necessary to perform the work required during an occasional outage.
 
 IV.
 
 22
 The status of I&M is reasonably susceptible to but a single inference; thus, this case presents a question of law for the Court to decide. Nichol, supra. The single reasonable inference is that NSS was a labor broker and I&M exercised significant control over the hiring, firing, payment and work of NSS employees at the Cook Facility. If the defendants' relationship had involved anything less technical than nuclear facilities, NSS may have had the independence of operation to be considered a contractor. However, due to the nature of the facility, I&M exercised strict regulation and control over NSS.
 
 
 23
 Plaintiff argues that the fact that this was a team of 60 persons rather than a single employee makes this case unique and requires submission to a jury. Although that distinction removes this case from the mainstream labor broker cases, it does not change the Court's analysis or conclusion. See e.g., White v. Central Transport, Inc., 150 Mich. App. 128, 388 N.W.2d 274, appeal denied, 425 Mich. 864 (1986).
 
 
 24
 Therefore, pursuant to the economic realities test, the Court finds that I&M was a co-employer of NSS employees, including Binder. Plaintiff's exclusive remedy against I&M is workers' compensation. Accordingly, the district court's opinion granting defendants' motion for summary judgment is AFFIRMED.
 
 
 
 [1]
 The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District of Michigan, sitting by designation